UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| RAFAEL L. WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00559-JRS-MKK |
| | ) | |
| JAY HENDRIX, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rafael Walker, who is incarcerated at Wabash Valley Correctional Facility, alleges in this case that he has been exposed to various unconstitutional conditions of confinement at that facility. The Defendants seek summary judgment on Mr. Walker's claims. For the reasons below, that motion is **GRANTED IN PART AND DENIED IN PART**.

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need

not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.[1]

**A. Mold**

Mr. Walker was incarcerated at Wabash Valley from January 2021 through December 15, 2023. He lived in the Secured Housing Unit ("SHU" a.k.a. "SCU"), which is a restricted housing unit where inmates are restricted to their cell for twenty-three hours per day and do not have a cellmate. Dkt. 61-1 at 13-14 (Walker Dep.). He lived in several different cells during the time that

---

[1] As a general matter, the Court notes that Mr. Walker often refers to "Defendants" in his response to the motion for summary judgment and in the designated evidence. These references have been disregarded in this statement of facts because these general references are not enough to provide sufficient evidence that any particular defendant was involved in the actions Mr. Walker claims. *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough.").

he was incarcerated in the SCU. *Id.* When Mr. Walker transferred to Wabash Valley, he noticed "this black stuff that grows on the doors, the toilets, the vents, the walls." *Id.* at 18. Mr. Walker described the substance as "black spores…like something is growing out of the wall like a fungus or something." Dkt. 61-1 at 19-20. The substance reappeared no matter how he attempted to clean it. *Id.* at 18.

Individuals in the SCU are responsible for cleaning their cells and were given the cleaning chemical GermAway to do so. Dkt. 61-3 ¶ 6 (Vanihel Aff.). Individuals in the SCU are given cleaning supplies several times per week. Dkt. 61-4 ¶ 5 (Simmerman Aff.). Mr. Walker tried to clean the substance with germicide and requested scratch pads, but he was never given any. Dkt. 62-1 at 20-21.

Mr. Walker notified Defendants about the presence of mold in his cell and filed grievances about the mold. *Id*. at 21; *see also* dkt. 61-2 at 98, 105 (Walker Grievances). Indeed, Wabash Valley received multiple complaints alleging mold in the SCU. Dkt. 61-3 ¶ 7. The SCU was inspected for mold by correctional staff, and they found no mold. *Id*. ¶ 8. On April 3, 2022, August Mack Environmental, Inc. ("August Mack") conducted a targeted mold assessment at Wabash Valley. August Mack was contracted in response to the allegations of mold in the SCU. Dkt. 61-3 ¶ 10 (Vanihel Aff.). August Mack performed visual assessments for mold on Cell Block 900 and Cell Block 700 in the SCU. Dkt. 61-6 at 1 (August Mack Report). They found "no significant evidence or signs of building-wide mold-related concerns…in the areas included as part of this assessment." *Id.* at 5. They found "[s]everal areas of minor mold growth and water damage…." *Id.* They recommended routine general cleaning of the cells to eliminate the potential for minor mold impacts due to general occupancy and usage of the areas. *Id.* at 5. In addition, individuals in the SCU were moved to temporary cell locations while sanitation crews scrubbed the cells. Dkt. 61-3

¶ 11; dkt. 61-1 at 25-26. Sanitation workers cleaned cells and showers with PerformX. Dkt. 61-3 ¶ 12. Defendant Christopher Holcomb, a lieutenant in the SCU, also used PerformX to clean cells when individuals alleged mold was present. Dkt. 61-5 ¶ 2. He also used bleach to clean the showers in the SCU every two weeks. *Id.*

In September of 2022, Mr. Walker took samples from his cell and sent them to Envirohealth Consulting, who confirmed that there was mold in his cell. Dkt. 62-1 at 23-24; dkt 71-1 at 174, 191. He showed those results to Lieutenant Holcomb. Dkt. 62-1 at 31.[2] There is no evidence that any additional efforts were made to remediate the mold at that time.

Mr. Walker submitted an informal grievance to Ms. Crichfield on March 26, 2023, stating that there was mold in his cell. Dkt. 71-1 at 15.

**B. Heat**

Mr. Walker was on suicide watch from December 28, 2021, until January 5, 2022. Dkt. 62-1 at 64-65. During that time, he was stripped of all his clothes and possessions. *Id.* He noticed that there was not any heat going into the cell. *Id.* at 64. The cold conditions continued when he moved back into his cell for about a month. *Id.* at 65. After he was released from suicide watch, Mr. Walker had a jumpsuit, boxers, t-shirts, socks, sweatpants, a coat, and a winter hat. *Id.* at 65-66. While Mr. Walker contends without support in his response to the motion for summary judgment that the temperature in his cell was below freezing, he testified at his deposition that he does not know what the temperature was inside of his cell. *Id.* at 66.

---

[2] Mr. Walker asserts in his response to the motion for summary judgment generally that he made the Defendants aware of the test results, but the document he cites for this proposition is a Grievance Appeal, which was signed by a non-party. Dkt. 71 at 10 (citing Dkt. 71-1 at 81-82). He also testified at his deposition that he "may have" shared the results with Warden Vanihel and Ms. Crichfield, but this is not specific enough testimony to allow a factfinder to conclude that he did do so. Dkt. 61-1 at 33; *See Daugherty*, 906 F.3d at 611.

During this time, COVID-19 was affecting production and delivery of items needed for the furnaces at Wabash Valley. Dkt. 61-3 ¶ 13. Specifically, Wabash Valley could not timely receive the motherboards needed for the heating system. *Id.* When a heating system within the facility went down, staff within the SCU provided extra blankets to individuals, placed industrial space heaters on the ranges in the SCU, and covered outside-facing doors with blankets to help insulate the building. *Id*. ¶ 15. Temperature checks are performed and logged daily in the SCU. DKt. 61-3 ¶ 14; dkt. 61-7 (Temperature Logs). Those logs reflect that the temperature in the SCU at the time at issue was between 68 and 72 degrees. *See generally id.*

### C. Lighting

Cells within the SCU have one framed-in light that includes a daytime light and a nighttime light. The nighttime light provides low light so that staff can see into the cell during the night for security reasons. Dkt. 61-3 ¶ 20. There are also backup lights in the SCU so that, whenever a light went out, inmates were not left in the dark. There is also a small amount of natural light that gets in through the ceiling in the SCU during the day if lights are not working or turned off. *Id*. at ¶ 21.

Mr. Walker's light in his cell was left off for extended periods of time, and he was unable to read. Dkt. 61-1 at 69-70. Other times, his light would be left on which affected his sleeping ability. *Id.*

### D. Day Room and Rec Cages

Mr. Walker contends that the walls in the dayroom, which included "anything outside [his] cell," were not clean and contained urine, feces, and dry food. Dkt. 61-1 at 55-56. Mr. Walker never had access to the dayroom outside of being transported through the dayroom. *Id*. at 56. The day room, including the range in the SCU, is cleaned every day by the detail workers who are

inmates in the SCU. Dkt. 61-5 at ¶ 15. Mr. Walker testifies that detail workers were unable to reach the affected areas. Dkt. 61-1 at 58.

Mr. Walker filed multiple grievances about the conditions in the dayroom and rec cages, to which Defendants Crichfield and Wellington responded. Dkt. 61-1 at 61. Netting was placed around the outdoor recreation cages where inmates in the SCU take their recreation to prevent animals or pests such as birds from getting into the cages. Dkt. 61-5 ¶ 16. The outside rec cages were also cleaned at least once per week.[3] *Id.*

### E. Flooding

Mr. Walker alleges that his cell was flooded with toilet water contaminated with feces and urine on several occasions.[4] He complained to Defendant Stevenson, but Stevenson refused to pull Mr. Walker out of his cell to clean. Dkt. 61-1 at 47.[5] Another time, Defendants Neff and Simmerman denied him supplies. Dkt. 61-1 at 47; dkt. 71-1 at 219.

### F. Water

Periodic flooding happens in the SCU, which is usually caused by inmates intentionally clogging drains in their cells. Dkt. 61-5 ¶ 17. When there was flooding in the SCU, staff would locate the source of the leak, then shut the water off to prevent further flooding. *Id.* A crew would

---

[3] Mr. Walker attempts to contest this fact, stating that "multiple witnesses, including myself have witnessed that Defendants rarely cleaned cages." Dkt. 71 at 26. But Mr. Walker has not presented evidence from anyone with direct personal knowledge regarding whether the rec cages were cleaned regularly. *See* dkt. 71-1 at 92-93 (testifying that he was not in view of the rec cages and went out to recreation only every other day).
[4] The Defendants contend that no claim regarding the flooding of Mr. Walker's cell was recognized by the Court, but the Court's screening order did recognize claims "regarding the condition of his cell…." Dkt. 18 at 3.
[5] Mr. Walker contends, without designating supporting evidence, in his motion for summary judgment that Defendants Stevenson and Scott refused to let him clean his cell, but at his deposition, he testified only that Defendant Stevenson denied him supplies. Dkt. 61-1 at 47-48 ("I don't know if Officer Scott was with him."). He also contends that the grievance officials refused to address the issues with cleaning his cell. But he has not designated evidence to allow a conclusion that the grievance officers knew about the conditions of his cell at the time he was experiencing them.

then clear off water from a range and inmates with water in their cell were removed while their cells were sanitized. *Id.* Once the issue with the flooding subsided, the water was turned back on. *Id.* ¶ 17. During the cleaning, Mr. Walker's water would be cut off for hours at a time. Dkt. 61-1 at 18.[6]

Mr. Walker filed a grievance on November 8, 2021, alleging that there was flooding, and that his water was cut off. Dkt. 61-2 at 3.

### G. Retaliation

Mr. Walker filed "hundreds if not thousands of grievances" while incarcerated at WVCF. Dkt. 61-1 at 71.

He testified that he filed a retaliation claim against Defendants Wellington and Crichfield because they would respond to his grievances by calling them frivolous. *Id.* at 71. In responding to grievances, Defendants were required to follow the IDOC Offender Grievance Policy. Dkt. 61-9 ¶ 6 (Wellington Aff.). The policy regarding the grievance process prohibits inmates from abusing or misusing the offender grievance process by attempting to flood the process with excessive numbers of grievances or frivolous grievances. *Id.* ¶ 9. If an inmate filed multiple grievances on the same issue within a close period, they receive a response to the first grievance, and the others were logged but returned to the offender as duplicative. *Id.* ¶ 10.

Mr. Walker also testified generally that "all of the Defendants engaged in retaliation of protected speech," and that their retaliation was a "multitude of acts. It wasn't anything specific." Dkt. 61-1 at 81. He did state that, on one occasion, Officer Stevenson told him that he was refusing Mr. Walker cleaning supplies when his cell had been flooded with contaminated water because he had filed a lawsuit. *Id.* at 47. In addition, Lieutenant Holcomb, as well as other Defendants referred

---

[6] Mr. Walker contends in his summary judgment response that he was left without water for "over a month," but he does not designate evidence to support this contention.

to Mr. Walker as a snitch and a homosexual for filing a complaint and complaining about an assault that happened against him in January of 2022. *Id*. at 82-84.[7] Mr. Walker has provided an affidavit stating: "I have been threatened and harassed by Sgt. Jobe, Sgt. Simmerman, Ofc. Tierney, Ofc. Stevenson, Ofc. Neff and multiple other IDOC Staff. Sergeant Jobe and Officer Tierney have told multiple inmates that I'm a snitch and my life has been threatened on multiple occasions and I have been told that I will be killed if I don't pay for safety." Dkt. 71-1 at 236.[8]

## III.
## Discussion

The Defendants seek summary judgment on Mr. Walker's Eighth Amendment conditions-of-confinement and First Amendment retaliation claims.

**A. Conditions of Confinement**

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate

---

[7] Mr. Walker testified at his deposition that "I was personally told by some of these Defendants and others named in this case and others not named in this case that this was the reason why I was being treated the way I was being treated." Dkt. 61-1 at 81-82. Again, this testimony is not specific enough to allow a conclusion that any particular person told Mr. Walker he was being treated in a specific way because of filing grievances or lawsuits.

[8] Mr. Walker has submitted affidavits from other inmates stating they have witnessed Wabash Valley officers retaliate against Mr. Walker. *See* dkt. 71-1 at 237-246. But none of these affidavits identify specific officers who are alleged to have retaliated against Mr. Walker.

indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

In addition, "individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

### 1. Mold

First, the Defendants do not dispute that the presence of mold could create an objectively serious condition. They argue, however, that they were not deliberately indifferent to that condition.

Here, it is undisputed that Defendants: Provided individuals in the SCU with the cleaning chemical GermAway, dkt. 61-3 ¶ 6; inspected the SCU for mold and hired August Mack to conduct a mold assessment, which found some mold, but no evidence of a building-wide issue and recommended routine cleaning, among other things, dkt. 61-3 ¶ 8, 10; moved individuals in the SCU to temporary cells while sanitation workers cleaned them, dkt. 61-3 ¶ 11; and used PerformX to clean cells and bleach to clean the showers. *Id.* 61-5 ¶ 2.

Defendants compare Mr. Walker's mold claims to those in *Hickingbottom v. Hendrix, et al.*, 2:22-cv-38-JRS-MKK, in which the plaintiff brought Eighth Amendment claims based on similar allegations of mold in the Wabash Valley SCU. In that case, the designated evidence was that after Mr. Hickingbottom showed the September 2022 EnviroHealth report to Warden Vanihel and Lieutenant Holcomb, prison officials moved inmates and tried to remediate the mold, which led the Court to conclude that there was no evidence to support a deliberate indifference claim. *Hickingbottom*, dkt 89 at 9, 17. Here, the designated evidence is different. Mr. Walker testified that correctional officials moved inmates in the SCU to power wash the mold in June or July of 2022, before the EnviroHealth report. Dkt. 61-1 at 25-26. Then, Mr. Walker showed the report to Lieutenant Holcomb. There is no designated evidence in this case regarding what steps Lieutenant Holcomb took after he was made aware of the September 2022 report.

Here, like in *Hickingbottom*, there is no evidence that any Defendant was deliberately indifferent to the mold in Mr. Walker's housing unit before the EnviroHealth report. Defendants gave inmates cleaning supplies and power washed the range. There is therefore no evidence that the defendants at that time "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720.

But, after Lieutenant Holcomb was made aware of the EnviroHealth report, there is no designated evidence in this case that he took any additional measures to try to remediate the mold. Therefore, on the record before the Court, there is evidence from which a jury could conclude that Lieutenant Holcomb was aware that the mold in the SCU was still a problem and failed to take further measures to clean it. On the other hand, there is no evidence that any of the other

Defendants were aware of the EnviroHealth report.[9] Therefore, all Defendants but Lieutenant Holcomb are entitled to summary judgment on this claim. *See Colbert*, 851 F.3d at 657.

### 2. Heat

Under the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, including adequate heat. *Haywood v. Hathaway*, 842 F.3d 1026, 1030 (7th Cir. 2016) (Eighth Amendment was violated when inmate was confined for 60 days in a cell with a broken window and temperatures below freezing with blowers blowing and guards refusing to provide blankets or coat).

Here, however, there is no evidence that would allow a reasonable jury to conclude that Mr. Walker was denied adequate heat or that any of the defendants were deliberately indifferent to the cold in his cell. First, temperature checks were performed in the SCU daily and reflected that the temperature was regularly between about 68 and 72 degrees. Dkt. 61-7. Mr. Walker argues without citation to evidence that the temperature in his cell would drop below freezing, dkt. 71 at 17, but he admitted at his deposition that he did not know the temperature in his cell, dkt. 61-1 at 64-65. There is therefore no evidence that Mr. Walker was exposed to unconstitutionally cold temperatures. Further, although Wabash Valley did not always timely receive necessary parts for the heating system, SCU staff would provide extra blankets, place industrial space heaters on the SCU, and cover outside-facing doors with blankets. Dkt. 61-3 ¶ 15. There is therefore also no evidence that any of the Defendants was aware Mr. Walker was exposed to excessive cold and disregarded these conditions. The defendants are therefore entitled to summary judgment on Mr. Walker's claim that he was exposed to excessive cold.

---

[9] Mr. Walker designates one brief informal grievance he directed to Ms. Crichfield, but he doesn't provide affirmative evidence that he told her or any other defendant about the EnviroHealth report. *See* dkt. 71-12 at 15.

### 3. Flooding

Mr. Walker alleges that his cell was flooded with toilet water contaminated with feces and urine on several occasions. He designates evidence that he complained to Defendant Stevenson and was denied cleaning supplies and that Defendants Neff and Simmerman also denied him cleaning supplies. Dkt. 61-1 at 47; dkt. 71-1 at 219. Exposure to human waste may violate the Eighth Amendment. *See Hardeman v. Curran*, 933 F.3d 816, 821 (7th Cir. 2019) (recognizing clearly established right of inmates "not to be forced to live surrounded by their own and others' excrement"); *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (inadequate sanitation and exposure to sewage can create adverse conditions that deprive a plaintiff of the minimal civilized measure of life's necessities); *Merritt v. McClafferty*, No. 3:21-CV-502-DRL, 2023 WL 8543578, at *2 (N.D. Ind. Dec. 11, 2023) ("a reasonable jury could conclude that housing Mr. Merritt in a cell with sewage for twelve hours for no reason denied him the minimal civilized measure of life's necessities.").

Because Mr. Walker has designated evidence that Defendants Neff, Simmerman, and Stevenson knew his cell was flooded with toilet water and denied him cleaning supplies, they are not entitled to summary judgment on this claim.[10]

### 4. Lighting

Cells in the SCU have one framed-in light that includes a daytime light and a nighttime light. Dkt. 61-3 ¶ 20. The nighttime light provides low light so that staff can see into the cell during the night for security reasons. *Id.* There are also backup lights in the SCU so that, whenever a light went out, inmates were not left in the dark. And there is a small amount of natural light that gets in through the ceiling in the SCU during the day if lights are not working or turned off. *Id.* ¶ 21.

---

[10] Mr. Walker has not designated evidence that any other Defendant was involved in these acts.

12

Mr. Walker contends that during his time in the SCU, the Defendants "repeatedly refused to turn his light on or off." Dkt. 71 at 16. He further claims that the Defendants often left his light on all day or off all day. Dkt. 71 at 35. He contends that, on one occasion, on April 7, 2022, he went without a light forcing him to eat, read, and write in the dark. *Id.* at 36.

Mr. Walker does not designate evidence to dispute that there are backup lights in the SCU that provide light when the lights in a specific cell are out or that the light at night provides a low light to allow staff to see for security reasons. At most, he has presented evidence that his light was off or on at times. His allegations regarding the lighting in his cell are too vague to allow a conclusion that he was subjected an "extreme deprivation" which is required to maintain an Eighth Amendment claim. *See Vasquez v. Frank*, 290 Fed Appx. 927, 929 (7th Cir. 2008) (holding that "24–hour lighting involving a single, 9–watt fluorescent bulb does not objectively constitute an 'extreme deprivation.'"). The Defendants are therefore entitled to summary judgment on this claim.

### 5. Day Room and Rec Cages

The Defendants also seek summary judgment on Mr. Walker's claims regarding the conditions of the day room and rec cages.

First, the day room was cleaned daily. In addition, Mr. Walker was in the day room only when he was being transported through it. Because he spent so little time in the day room, there is no evidence that he was exposed to a serious risk to his health because of any alleged exposure to waste or dirt in the day room. Mr. Walker tries to resist this conclusion by arguing that his cell was within 10 feet of the day room and he was exposed to the unpleasant odors from the dayroom. Dkt. 71 at 37. But Mr. Walker does not designate evidence regarding his proximity to the day room and has not shown that this kind of proximity to allegedly unsanitary conditions combined with walking through the day room constitutes the kind of prolonged exposure to unsanitary conditions

that would violate the Eighth Amendment. *Love v. Milwaukee Cnty. Jail Staff*, No. 23-CV-408-PP, 2023 WL 4238870, at *3 (E.D. Wis. June 28, 2023) (days-long exposure to unsanitary conditions are the type of conditions that constitute an extreme deprivation that would violate the Eighth Amendment) (citing cases). The same is true of the rec cages. The designated evidence is that the rec cages were cleaned regularly, that the Defendants made efforts to keep birds out of them, and that Mr. Walker spent only brief periods in the rec cages.

The Defendants are therefore entitled to summary judgment on Mr. Walker's claims regarding the conditions of the day room and rec cages.

### 6. Water

When there is flooding within the SCU, staff within the SCU would locate the source of the leak, then shut the water off to prevent further flooding. A crew would then clear off water from a range and inmates with water in their cell were removed while their cell was sanitized. Once the issue with the flooding subsides, the water would be turned back on. *Id*. at 2-3, ¶ 17. The Defendants are therefore entitled to summary judgment on any claim that Mr. Walker's water was shut off for brief periods of time. *See Young v. Schwenn*, No. 19-CV-742-BBC, 2021 WL 3662906, at *4 (W.D. Wis. Aug. 18, 2021) (denying summary judgment on claims that prisoner was denied water for hours at a time).

### B. Retaliation

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th

14

Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

The Defendants do not dispute that Mr. Walker engaged in protected First Amendment activity by filing lawsuits and grievances, so the Court focuses on the second and third elements.

### 1. Deprivation Likely to Deter Future First Amendment Activity

Whether allegedly retaliatory conduct would "deter a person of ordinary firmness" from exercising his First Amendment rights is an objective test, *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), and the standard "does not hinge on the personal experience of the plaintiff," *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020). The Defendants argue that denying Mr. Walker cleaning supplies, failing to process his grievances, and calling him a snitch are not deprivations likely to deter a person of ordinary firmness from continuing to participate in First Amendment activity.

First, Officer Stevenson's denial of cleaning supplies when Mr. Walker's cell was contaminated with toilet water is the type of deprivation that would deter a person of ordinary firmness from participating in First Amendment activity. *See Donelson v. Atchison*, No. 14-CV-1311-SMY-RJD, 2017 WL 5999096, at *5 (S.D. Ill. Dec. 4, 2017) (placing a prisoner in a cell with an unpleasant odor, piles of trash, and a soiled mattress for several hours would dissuade a person of ordinary firmness).

Next, Mr. Walker has designated evidence that Defendants Lieutenant Holcomb, Officer Stevenson, and Officer Neff called him a snitch, leading to harassment and threats. A reasonable jury could find that these actions would deter a person of ordinary firmness from filing lawsuits or

15

grievances. *See Childs v. Rudolph*, No. 22-CV-572-JDP, 2024 WL 639859, at *4 (W.D. Wis. Feb. 15, 2024); *Owens v. Ebers*, No. 14-CV-1421-SCW, 2017 WL 4298125, at *4 (S.D. Ill. Sept. 28, 2017) (calling an inmate a "snitch" in front of other officers could support a retaliation claim).

Finally, however, failing to process grievances is not the type of activity that would deter a person of ordinary firmness. *See Smith v. Butler*, No. 17-CV-189-MJR, 2017 WL 1318270, at *7 (S.D. Ill. Apr. 10, 2017). Defendants Wellington and Crichfield[11] were only involved in the grievance process and are therefore entitled to summary judgment on this claim.

### 2. Motivating Factor

"The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013). But "[s]uspicious timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Manuel*, 966 F.3d at 680 (cleaned up) (standing alone, fact that inmate's cell was shaken down nine minutes after he engaged in First Amendment protected activity could not create triable issue of fact as to retaliation claim because another, non-retaliatory motive existed. *Id.* at 680–81).

Mr. Walker has testified that on one occasion, Officer Stevenson told him that Officer Stevenson was refusing Mr. Walker cleaning supplies when his cell had been flooded with

---

[11] As discussed above, Mr. Walker has not designated specific evidence that any other Defendant took any retaliatory actions.

contaminated water because he had filed a lawsuit. Dkt. 61-1 at 47. This is direct evidence that, if believed by a jury, Officer Stevenson acted with retaliatory animus. He therefore is not entitled to summary judgment on Mr. Walker's retaliation claim.

As to Defendants Lieutenant Holcomb, Officer Stevenson, and Officer Neff, however, Mr. Walker has not designated evidence that they called him a snitch and otherwise harassed him because he filed grievances and lawsuits.[12]

### IV.
### Conclusion

The Defendants' motion for summary judgment, dkt. [60], is **GRANTED IN PART AND DENIED IN PART**.

The motion is **DENIED** as to the following claims:

- Mr. Walker's claim against Lieutenant Holcomb that Mr. Walker was exposed to mold in violation of his Eighth Amendment rights;

- Mr. Walker's clam against Defendants Neff, Simmerman, and Stevenson that Mr. Walker was not allowed to clean his cell when it was flooded with toilet water; and

- Mr. Walker's claim that Officer Stevenson retaliated against him when Officer Stevenson denied Mr. Walker cleaning supplies.

The motion is, in all other respects, **GRANTED**. The **clerk shall terminate** all defendants except Holcomb, Neff, Simmerman, and Stevenson on the docket.

---

[12] Mr. Walker asserts in his response to the summary judgment motion that they told him they did so because of his lawsuits, but he does not designate evidence to support this contention. Dkt. 71 at 40. And, as discussed in Part II.G of this Order, Mr. Walker's general testimony that some of the Defendants and others told him he was being treated the way he was treated is too vague to allow a conclusion that any particular defendant acted for retaliatory reasons.

The Court prefers that Mr. Walker be represented by counsel for the remainder of this action. The **clerk is directed** to send Mr. Walker a motion for assistance recruiting counsel with his copy of this Order. Mr. Walker has **twenty-eight days**, to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

**IT IS SO ORDERED.**

Date: 3/19/2025

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

RAFAEL L. WALKER
166671
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel

Chambers of Magistrate Judge Klump

18